*[handwritten top margin]* 912, 913 ... "... rending in Federal procedure"

*[handwritten right margin]* STATE evidence and crimes for a Federal warrant

*[handwritten left margin, vertical]* I of federal law enforcement officer or an attorney for the government

*[handwritten left margin, vertical]* of a municipal judge sign a warrant in a federal case that could be a serious legal issue

IN THE AKRON MUNICIPAL COURT
SUMMIT COUNTY, OHIO

STATE OF OHIO )
CITY OF AKRON ) SS:
SUMMIT COUNTY )

AFFIDAVIT FOR SEARCH WARRANT

Detective M.V. Gilbride # 1182, being first duly sworn according to law, deposes and says that he believes and has good cause to believe that books, records, (including those stored electronically to include cellular phones, "Blackberry" messaging devices), documents, receipts, notes, ledgers and other papers and electronic equipment to store information relating to the possession, transportation, ordering, purchase and distribution of controlled substances, in particular, cocaine, bank statements and records and other items evidencing the obtaining, secreting, transfer and/or concealment and/or expenditure of money; financial proceeds, namely U.S. Currency, photographs, indicia of occupancy; and other fruits, instrumentalities and evidence related to drug trafficking are being illegally possessed within 698 (SOUTHERN APARTMENT) (DUPLEX) AKRON, SUMMIT COUNTY, OHIO 44310 which is a blue with white trim, 2 1/2 story, wood frame, multi-unit residence which faces east toward Carlysle Street. 696 Carlysle Street is the southern unit of the side-by-side duplex and 698 Carlysle Street is the northern unit of the side-by-side duplex. Both units are contained in a single dwelling sub-divided into separate units. The driveway is located directly south of the main structure and there in so apparent garage. The residence is further described as being the fourth structure on the west side of Carlysle Street north of Shelby Street. There are no visible numerals on the residence as viewed from Carlysle Street. Also to be searched is the curtilage to the premises.

If found, such items as: books, records, (including those stored electronically to include cellular phones, "Blackberry" messaging devices), documents, receipts, notes, ledgers and other papers and electronic equipment to store information relating to the possession, transportation, ordering, purchase and distribution of controlled substances, in particular, cocaine, bank statements and records and other items evidencing the obtaining, secreting, transfer and/or concealment and/or expenditure of money; financial proceeds, namely U.S. Currency, photographs, indicia of occupancy; and other fruits, instrumentalities and evidence related to drug trafficking, will be seized and used as evidence in the prosecution of the person found in control for a violation of Section 2925.11 of the Ohio Revised Code, "Drug Abuse" and Section 2925.03 "Drug Trafficking".

*[handwritten] STATE crimes*

THIS KNOWLEDGE IS BASED UPON THE FOLLOWING FACTS:

1.   Affiant is a member of the Akron Police Department, and has been so employed for the past 19 years. Affiant's current assignment is with the Akron Narcotics Detail as a Task Force Officer (TFO) of the Drug Enforcement Administration (DEA) Cleveland District Office (CDO) Enforcement Group 2. Affiant has been a DEA TFO since October 2014.

*[handwritten] Falsehood*

2.   Affiant's experience as a DEA TFO includes, but is not limited to: physical surveillance; supervising the purchases of controlled substances by undercover agents and informants; acting in an undercover capacity to purchase controlled substances; debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity; compiling, organizing and analyzing pen register and telephone toll data; interviewing witnesses; drafting

*[handwritten bottom left]* Exhibit A

search warrants seeking seizure of illegal drugs and other evidence of drug violations; searching locations and seizing narcotics, "tools of trade," documents, and the monetary gains of narcotic trafficking; drafting and executing court authorized Title III wire interception orders; supervising investigators during court authorized wiretaps; providing Grand Jury and court testimony; assisting Assistant U.S. Attorneys in the prosecution of defendants on trial for Federal drug violations; testifying as both a fact witness and an expert "opinion" witness concerning the violations of Federal and State drug laws.

I have had formal law enforcement training and also have been personally involved in numerous investigations of offenses involving the possession, sale, storage, and distribution of heroin, methamphetamine, crystal methamphetamine, cocaine, crack cocaine, and marijuana. I have been involved in numerous prior wiretap investigations which focused on dismantling organizations involved in the distribution of narcotics.

3.     I have used confidential informants on numerous occasions to investigate individuals and drug trafficking organizations (DTOs). Through informant interviews, and extensive debriefings of individuals involved in narcotics trafficking, I have learned the manner in which individuals and organizations distribute controlled substances in Ohio, the domestic United States and areas abroad.

4.     I have supervised purchases of controlled substances by informants, cooperating witnesses, and undercover officers, as well as acted in an undercover capacity. I have extensive experience conducting street surveillance of individuals engaged in narcotics trafficking activities. I have also participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, drug trafficking records, and drug proceeds were seized by law enforcement.

5.     Through training and experience, I am very familiar with the appearance and street names of various controlled substances, including heroin, methamphetamine, crystal methamphetamine, cocaine, crack cocaine and marijuana. I also know the street values of different quantities of these controlled substances, and am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.

6.     Through training and experience, I am also familiar with the language used by drug traffickers to discuss their illegal activities. I know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances.

7.     Through training and experience, I know that individuals engaged in organized drug distribution maintain telephone contact with various persons throughout the country from whom they receive drugs, drug paraphernalia, drug information, and information on law enforcement efforts, as well as information about others in the local area who are competing in the unlawful activity. The use of telephones, especially cellular telephones, is essential for maintaining timely long-distance and local contacts with the drug suppliers, and down the organizational chain to the local traffickers.

8.     Affiant knows narcotics distributors will frequently use pre-paid cellular telephones due to their anonymity and the ease of obtaining and/or discarding the telephone in the event the individual feels he has been compromised. Organized drug traffickers prefer to use these cellular telephones to thwart law enforcement efforts, and can increase service minutes at any time with

little or no inconvenience or disruption to their illegal activities. Furthermore, drug traffickers often use multiple cellular telephones to facilitate narcotics related transactions.

9. Affiant knows from training and experience that narcotics traffickers more recently have begun using text messaging to further their illicit business. The text message enables the professional drug dealer to instantly communicate with associates in a secure setting. Furthermore, it adds a layer of protection because of its anonymous nature, that is, the message is sent from a cellular telephone, but cannot be conclusively linked to an individual (unlike a voice communication).

10. Finally, As a result of training and experience, Affiant knows the following about drug traffickers:

10a. Individuals who deal in illegal controlled substances maintain books, records, notes, ledgers, and other papers relating to current and past manufacture, transportation, purchase, sale, and distribution of controlled substances, even though such documents may be in code. Such drug records can also be stored in computer memory media.

10b. Individuals who deal in illegal controlled substances frequently take, or cause to be taken, photographs of themselves, their associates, their property and their product.

10c. Individuals who are engaged in large-scale narcotics operations usually maintain readily available and substantial amounts of United States currency in order to finance ongoing drug business.

10d. Individuals who deal in illegal controlled substances often seek to conceal profits and proceeds by placing assets in names other than their own, to include multiple individual or business names.

10 e. Although assets may be titled in other persons' or company names, individuals who deal in illegal controlled substances continue to use those assets and exercise dominion and control over them. Such defacto ownership is often proven during residence searches by the drug dealers' possession of the assets themselves or documentation, titles keys, etc., even though the assets may be titled in a third party name.

10 f. Individuals who deal in illegal controlled substances usually do not report their illegal earnings on tax returns. Comparing large defacto assets to small reported income is powerful evidence of money laundering and tax evasion crimes. When this difference is divided by an established profit margin per unit of drugs, the size of a drug dealer's past drug transactions can be revealed.

10g. Individuals who are engaged in large-scale narcotics operations frequently attempt to legitimize profits derived from their narcotics business. Affiant knows that to accomplish these goals, those engaged in drug trafficking commonly utilize false and fictitious personal or business records, shell corporations and business front, and sham transactions involving foreign and domestic banking transactions, securities, cashier's checks, money drafts and real estate.

10h.  Affiant knows that it is essential that members of such organized groups personally meet with larger drug suppliers to obtain the illegal goods they resell to their customers for a profit.  It is also essential that they occasionally meet with other members of their drug distribution conspiracy to divide their illegal proceeds.  Documentation evidencing such travel can usually be found in the residences/businesses of the drug organization's members.

10i.  Affiant further knows from his training and experience that persons involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities, the locations at which drug transactions take place, the locations where they store their drugs, and the flow of proceeds derived from their illicit drug transactions into "clean" currency.  In addition, it is Affiant's experience that drug traffickers seldom will conduct drug transactions at their primary residence for fear of being robbed of drug proceeds and/or narcotics by other drug traffickers, and/or to thwart law enforcement detection.

10j.  Finally, through training and experience, Affiant knows that even though drug transactions take place at varied locations, substantial drug traffickers, such as the subjects of this investigation, almost always keep records/documents/papers relating to their associates, including telephone and other contact numbers, and drug transactions, including records of receipt and distribution of drugs and money, even though these records are often in code.  Unlike obviously incriminating or consumable items, these types of records, documents and papers, as well as those described above tend to be viewed by drug traffickers as rather innocuous and not particularly incriminating; thus such items are likely to be kept for lengthy periods of time.  Furthermore, these "personal" type of items are almost always found at the traffickers' residence, even if that location changes (i.e., the trafficker moves to a new residence).  These types of records, documents, and papers also are frequently kept at business or other locations used by traffickers to conduct illegal transactions.

## BASIS OF INFORMATION

11.  Except as otherwise noted, the information set forth in this Affidavit has been provided to myself and by members of the Akron - Summit County (HIDTA) Initiative, DEA SAs, or other law enforcement agents or officers.  Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, information resulting from physical surveillance, except where otherwise indicated, does not necessarily set forth my observations, but rather has been provided directly or indirectly through members of the HIDTA, other DEA SAs, or other law enforcement officers who conducted the surveillance.  Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects, and record checks has been obtained through the Law Enforcement Automated Data System (LEADS) from the State of Ohio or the National Crime Information Center (NCIC) computers.

21.  All subscriber, toll record, pen register and trap and trace information contained herein was obtained by court order or subpoena.

12.  During the course of this investigation, federal and local law enforcement agents directed controlled drug purchases.  The agents advised me that the controlled drug purchases were conducted in the following manner, unless otherwise specified: agents searched the confidential source purchasing the drugs for drugs and money before the controlled purchase.

Agents placed a body recorder and/or electronic transmitter on the body of the confidential source and agents provided the confidential source with official authorized funds to purchase narcotics. Agents gave the confidential source instructions to attempt the drug purchase from a specified subject. Law enforcement personnel maintained constant audio and/or visual surveillance, to the extent practicable, of the confidential source during the transaction. Upon completion of the attempted drug purchase, law enforcement personnel promptly met with the confidential source and again searched the source and secured from him any just purchased substance(s). All purchased substance(s) were field-tested by law enforcement personnel and will be submitted to a federal, state, or local laboratory for analysis.

13. During the course of this investigation, conversations of the target subjects were consensually recorded by confidential sources herein. Unless otherwise noted, these consensually recorded conversations were made at the direction of me, and either in my presence and/or my colleagues'. One of my colleagues or I also observed the number that the confidential source dialed.

## RELIABILITY OF CONFIDENTIAL SOURCES

14. During the course of this investigation, law enforcement agents and officers received information from confidential sources concerning WILLIE R. BENTON JR. Affiant has outlined information from one confidential sources in this Affidavit. Affiant labeled the confidential sources as "CS" followed by a number designation. Additionally, Affiant only refers to the confidential sources in the masculine gender throughout the Affidavit, without regard to the actual gender of the confidential source. To the extent practicable, law enforcement has corroborated the information provided by the confidential sources through physical surveillance, reviewing records, monitoring consensually recorded telephonic and personal conversations and other investigative techniques.

### CS-1

15. CS-1 has provided information to the Summit County Drug Unit and DEA since May of 2017. To the extent practicable, law enforcement has corroborated much of the information provided by CS-1, which has been corroborated through independent investigation, statements of other confidential sources, police reports, physical surveillance, consensual recordings, controlled purchases of drugs, and other law enforcement activities. CS-1 has provided reliable information in the past concerning drug trafficking in the Akron, Ohio, area, and has proactively assisted law enforcement by making controlled purchases. As it relates to this investigation, CS-1 pro-actively assisted law enforcement by making a controlled drug purchase from WILLIE R. BENTON JR. AKA: "Ghetto". CS-1 has a drug related criminal history and CS-1 is still actively providing information to law enforcement. CS-1 received prosecutorial consideration for the information provided.

16. Based upon the totality of the foregoing, I believe in the reliability of the information provided by CS-1.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

16. Because this affidavit is submitted for the limited purpose of securing a drug and records and documents search warrant for the above-described premises as a result of an ongoing pattern of criminal conduct, Affiant has not included each and every fact known concerning this investigation. Affiant has only set forth the facts that Affiant believes are essential to establish the necessary foundation for the requested warrant/order.

17. On March 15, 2018, CS-1 purchased approximately 126 grams of cocaine for $4,500.00 from BENTON JR. during a controlled buy at 696 Carlysle Street Akron, Ohio.

18. Prior to meeting and under the direction of investigators, CS-1 made prior arrangements to "*meet*" with BENTON JR. and purchase narcotics. Specifically, at approximately 1:52 p.m., CS-2 sent BENTON JR. a text message to TT-1 that read: "*What up*". [Note: Earlier on March 15, 2018 at approximately 11:47 a.m. BENTON JR. sent an outgoing SMS message from TT-1 to CS-2 that read: "Yoooooooo". DEA SA Wehrmeyer confirmed the contact with BENTON JR. by reviewing and photographing CS-1's text message(s) with BENTON JR. as well as examining CS-1's cellular telephone SMS history. Affiant believes CS-1 attempted to make contact with BENTON JR. to conduct a cocaine transaction by texting 'What up'. BENTON JR. confirmed his availability to conduct a cocaine transaction by texting 'Yoooooooo'.

19. Prior to the controlled buy and in the presence of SA Wehrmeyer, and myself, CS-1 made a consensually recorded (outgoing) call from his cellular telephone to BENTON JR. at TT-1. SA Wehrmeyer observed the CS dial the above number for BENTON JR. BENTON JR. answered the phone and stated, "Yeah." CS-1 stated, "*Shit I was ready*." [to conduct a cocaine transaction]. BENTON JR. asked, "*You was talking the same one?*" [CS-1 was previously in the company of an unknown individual who purchased 1/8 kilogram of cocaine from BENTON JR. at 696 Carlysle.] CS-1 replied, "*Yeah. Yup.*" Both parties began talking over each other and became inaudible. CS-1 then asked, "*Huh?*" BENTON JR. replied "Yeah on the north come on." [at 696 Carlysle Street located in North Akron] CS-2 responded, "*Alright.*"

20. Following the phone call between CS-1 and BENTON JR., investigators established fixed surveillance at 696 Carlysle Street, Akron, Ohio. CS-1 traveled to 696 Carlysle Street and entered the residence through the rear, west-side door. While in the residence, agents overheard (via the transmitting device) BENTON JR. and CS-1 conducting a drug transaction. Surveillance units observed CS-2 leave 696 Carlysle Street, Akron, Ohio and followed him to a prearranged meet location where he relinquished the evidence.[1]

21. After the meeting CS-1 was debriefed by SA Wehrmeyer and Affiant. CS-1 stated he entered the residence through the rear door and into the kitchen after BENTON JR. let him in the house. CS-1 counted out the money and placed the currency on the kitchen counter top. BENTON JR. had the cocaine prepared for CS-1 to take and had placed the cocaine on the kitchen counter top. CS-2 took possession of the cocaine and then left the residence.

---

[1] Upon acquiring the evidence, it was processed and field tested by investigators prior to being submitted to the Ohio Bureau of Criminal Identification and Investigation for further analysis. The lab results are pending and the substance weighed approximately 126 gross grams and tested positive via Voltox field test kit for the presence of cocaine.

*Violates federal wiretap law 18 U.S.C. 2517*

*[left margin, rotated]: Suppressed as Fruit of the poisonous Tree under the 4th Amendment Chain of custody of improper or authorization*

22. On May 17, 2018 and June 14, 2018, United States District Judge John Adams, Northern District of Ohio, Eastern Division, signed an Order authorizing the initial interception of wire and electronic (text messages) communications to and from TT-1 cellular telephone known to be possessed and used by WILLIE R. BENTON JR. Monitoring and interception pursuant to the Court's Order commenced on April 18, 2018, and will *CEASE* on July 13, 2018, at approximately 11:59 p.m.

23. Court-authorized monitoring of TT-1 pursuant to the May 17, 2018 and June 14, 2018 Orders has resulted in the interception of significant narcotics-related telephone conversations and SMS / text messages. Affiant has probable cause to believe, based on a review of the wire communications to date, that BENTON JR. is principally a wholesale source of supply of cocaine and a retail source of supply of crystal methamphetamine to individuals in the Akron, Ohio, area to include TERRENCE F. BOYD, and MATTHEW VIRDEN. Additionally, I believe BENTON JR. has obtained cocaine and is currently obtaining cocaine from ARMANDO MERIDA.

24. On May 22, 2018 at approximately 7:38 p.m. BOYD placed an outgoing call from cellular facility (330) 344-0272 to BENTON JR. at TT-1. During the conversation BOYD stated, "I got another shitty bite, man, but god damn, man." BENTON JR.'s response was inaudible. BOYD then stated, "Shit, I know you don't want to be going through that, you wanting, I know it's all dust, he don't want to pick none of the chunks out." BENTON JR.'s response was again inaudible as he was mumbling. Shortly after BOYD stated, "I can't hear you bro. Your phone breaking up." BENTON JR. stated, "Yeah, there ain't no chunk in that motherfucker, but I show it to you." Shortly after BOYD stated, "I know, I'm not about to (inaudible) he ain't gonna want no dust though. That's the only problem. I try to figure something out." I believe BOYD informed he had a sale of crystal methamphetamine arranged referred to as a 'bite' with a drug customer however the drug customer wanted the crystal methamphetamine to be in chunks without any dust and cutting agent in the bag.

25. On May 22, 2018 at approximately 7:43 p.m. BOYD placed an outgoing call from cellular facility (330) 344-0272 to BENTON JR. at TT-1. During the conversation BOYD stated, "Let me get one for (inaudible) I'm trying to make these fly, he's gonna buy it anyway." After a brief conversation negotiating the price of the crystal methamphetamine BOYD asked, "Got two?" BENTON JR. replied, "Yeah." BOYD asked, "Are you northy?" BENTON JR. responded, "Yeah." BOYD stated, "Yep. I'll be there. I'm gonna take it straight to him. Yeah, my girl, my girl gonna take me." BENTON JR. responded, "Yeah." I believe BOYD initially asked BENTON JR. for one ounce of crystal methamphetamine by stating 'let me get one'. BOYD assured BENTON JR. that he was trying to sell the ounces of crystal methamphetamine by stating ' I'm trying to make these fly' and that BOYD's customer was going to buy the ounce anyway despite the fact that the ounce was comprised of powdery crystal methamphetamine and not chunks of the contraband. Shortly after BOYD asked if BENTON JR. had two ounces of crystal methamphetamine to which BENTON JR. replied 'Yeah'. BOYD asked if BENTON JR. was at 696 Carlysle Street referred to as 'northy' as the residence is located in north Akron and BENTON JR. confirmed he was there. BOYD confirmed he was coming to get the crystal

methamphetamine by stating 'Yep. I'll be there' and that he was taking the crystal methamphetamine straight to the customer. BOYD went on to inform BENTON JR. that his (BOYD) girlfriend was going to drive him to pick up the crystal methamphetamine from BENTON JR. and deliver it to the customer.

26. On May 22, 2018 at approximately 8:55 p.m. BOYD placed an outgoing call from cellular facility (330) 344-0272 to BENTON JR. at TT-1. During the conversation BOYD asked, "Bro, where you at bro?" BENTON JR. replied, "On the porch waiting for you." BOYD asked, "Huh?". BENTON JR. responded, "Sitting on the porch waiting for you." BOYD asked, "You are where?" BENTON JR. replied, "Sitting on the porch waiting for you." BOYD stated, "Oh, alright. I'm pulling up." I believe BENTON JR. informed BOYD he was sitting on the front porch of 696 Carlysle Street awaiting BOYD's arrival to give him 2 ounces of crystal methamphetamine. BOYD informed BENTON JR. that he was pulling up to the residence shortly.

27. At approximately 9:05 p.m. investigators of the Akron / Summit County HIDTA initiative observed via pole camera fixed on the rear of the residence as BENTON JR. walked across the driveway (presumably front porch) of 696 Carlysle Street and approach a white Jeep Cherokee that arrived and parked in the street near the driveway. Shortly after, the white Jeep Cherokee departed and BENTON JR. returned to 696 Carlysle Street.

28. Undercover investigators followed the white Jeep Cherokee as it left 696 Carlysle Street and confirmed the license plate as Ohio registration HHT 6058 registered to Sarah A. Allen of 1853 Delia Avenue Akron, Ohio. Surveillance of the vehicle continued to until uniformed Akron Police Patrol officers initiated a traffic stop near the intersection of W. Market St. and S. Rose Blvd. as a result of the failure to utilize a turn signal at the intersection of Portage Path and Bailey Avenue. During the traffic stop the driver was found to be Sarah Allen and the front seat passenger was identified as BOYD. Both parties stated they were coming from the store where they had purchased several DVD movies and were going home to watch them. Neither party mentioned traveling from 696 Carlysle Street nor meeting with BENTON JR. Allen was informed of her failure to utilize a turn signal and given a verbal warning for the violation. Both parties were released from the traffic stop after confirmation of their identities and a negative check for outstanding arrest warrants. The surveillance operation was then terminated.

29. On May 29, 2018 at approximately 3:28 p.m. Armando MERIDA placed an outgoing call from cellular facility (330) 475-9715 to BENTON JR. at TT-1. During the conversation MERIDA asked, "What's up? Hey, how much you owe me?" BENTON JR. replied, "Shit, I don't even know man. We need to talk. When we sitting down? I'm waiting on you." MERIDA responded, "Alright. I'll be there at uh, like 4:30 almost 5 o'clock. I believe MERIDA asked BENTON JR. how much BENTON JR. owed him from the previous cocaine delivery that MERIDA provided to BENTON JR. on consignment. BENTON JR. stated he did not know the amount and asked to sit down with MERIDA to discuss the matter. MERIDA told BENTON JR. he would meet with him between 4:30 and 5:00 P.M.

30. On May 29, 2018 at approximately 4:30 p.m. BENTON JR. placed an outgoing call from TT-1 to MERIDA at cellular facility (330) 475-9715. During the conversation BENTON JR. stated, "Yo." MERIDA replied, "Hey, I'm here." BENTON JR. replied, "Alright. Me too."

MERIDA stated, "Five minutes, Alright." I believe both parties confirmed to meet and discuss money owed for cocaine in five minutes after the call ended."

31. On May 29, 2018 at approximately 4:36 p.m., TFO Brian Callahan observed (via pol camera) BENTON JR.'s vehicle arrive at 696 Carlysle Street, Akron, Ohio. At approximately 4:40 p.m., TFO Callahan observed a juvenile female exit the passenger side of BENTON JR.'s vehicle and entered the residence. BENTON JR. also exited his vehicle and entered the residence. After a short time, BENTON JR. and the juvenile female exited his residence and BENTON JR. escorted the juvenile female into the adjoining residence, which is known to investigators to be occupied by BENTON JR.'s mother Crystal Shannon. BENTON JR. then returned to his residence.

32. On May 29, 2018 at approximately 4:43 p.m., TFO Callahan observed a white Ford van displaying Ohio license plate PJQ-2983 arrive at 696 Carlysle Street, Akron, Ohio. ARMANDO MERIDA exited the white Ford van and walked into BENTON JR.'s residence.

33. On May 29, 2018 at approximately 4:46 p.m., TFO Callahan observed ARMANDO MERIDA walk out of BENTON JR.'s residence, enter the white Ford van, and depart the residence. TFO Callahan positively identified MERIDA after viewing his Summit County Jail booking photograph.[2] MERIDA's height and weight also appeared similar to the height and weight listed on his license.

34. On May 29, 2018 at approximately 4:47 p.m. BENTON JR. placed an outgoing call from TT-1 to an unknown male at cellular facility (234) 788-5839. During the conversation BENTON JR. stated, "Alright. They just pulled up on me man. They said this weekend or next for sure." The unknown male replied, "Oh yeah?" BENTON JR. stated, "Yup I'm just calling to let you know." The unknown male asked, "Who? Our people or them other one?" BENTON JR. replied, "Oh no, our people. You know how they handle us." The unknown male replied, "Alright, yeah. (Inaudible) waiting man I'm ready. BENTON JR. stated, "Patiently, that's what I said. Patiently waiting man because I need every god damn crumb fuck that." The unknown male stated, "I ain't gonna lie bro, I been, I ain't been this focused in my life man. BENTON JR. responded, "Yup I got you soon man." The unknown male replied, "Help me help you man." BENTON JR. stated, "You already know I gotcha." The unknown male responded, "Alright." I believe BENTON JR. stated his cocaine supplier (MERIDA) just stopped by BENTON JR.'s residence and informed BENTON JR. he would be getting a shipment of cocaine this weekend or the following weekend. The unknown male asked if it was MERIDA or a different supplier and BENTON JR. told him it was MERIDA referred to as 'our people' and that they always take good care of BENTON JR. when providing him with large amounts of high quality cocaine. The unknown male assured BENTON JR. he was ready to help BENTON JR. by stating 'I ain't been this focused in my life man. BENTON JR. assured the unknown male he would give cocaine to him by stating 'Yup I got you soon,'

35. On May 29, 2018 at approximately 4:50 p.m. BENTON JR. placed an outgoing call from TT-1 to an unknown male at cellular facility (234) 706-1101. During the conversation BENTON JR. stated, "Yeah, the one, two, three is en route. The unknown male responded, "Ah,

---

[2] MERIDA was booked into the Summit County Jail on July 28, 2014 for the offense of Domestic Violence under the name of Armando Velasco. I am aware his full name is Armando Velasco MERIDA.

okay." I believe BENTON JR. informed the unknown male that cocaine was enroute and the unknown male replied okay.

36. On May 29, 2018 at approximately 4:56 BENTON JR. sent an outgoing SMS message from TT-1 to MATTHEW VIRDEN at cellular facility (234) 706-1101 that read: "Going down soon". I believe BENTON JR. informed the unknown male that a shipment of cocaine would be arriving soon (from MERIDA).

37. On May 29, 2018 at approximately 6:34 p.m. VIRDEN utilizing cellular facility (234) 706-1101 sent an outgoing SMS message to BENTON JR. at TT-1 that read: "Need 2 when ever ready". I believe the unknown male asked for 2 kilograms of cocaine whenever MERIDA brings them.

38. On May 29, 2018 at approximately 6:37 BENTON JR. sent an outgoing SMS message from TT-1 to VIRDEN at cellular facility (234) 706-1101 that read: "Yup". I believe BENTON JR. assured the unknown male that he would give him 2 kilograms upon their arrival from MERIDA.

39. On May 29, 2018 at approximately 9:49 p.m. an unknown male utilizing cellular facility (216) 414-9577 sent an outgoing SMS message to BENTON JR. at TT-1 that read: "Damn. Piano dude came?" I believe the unknown asked if BENTON JR.'s cocaine supplier came by BENTON JR.'s house. I am aware from training and experience that cocaine suppliers are sometimes referred to as a 'piano man' as pianos have keys which is coded language for kilograms.

40. On May 29, 2018 at approximately 10:07 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown male at cellular facility (216) 414-9577 that read: "Yup", I believe BENTON JR. confirmed that his cocaine supplier (MERIDA) came by to see him earlier (and assured him of an upcoming delivery of cocaine).

41. On June 5, 2018 at approximately 5:11 p.m. MERIDA placed an outgoing call from cellular facility (330) 957-9907 to BENTON JR. at TT-1. During the conversation MERIDA asked, "You good? You got me today or you wanna make it tomorrow?" Both parties were having difficulty understanding each other as they were talking over each other and MERIDA speaks with a heavy Spanish accent. Later in the conversation MERIDA stated, "Twenty minutes? No, no, no, no, no. Cancel, cancel. Let's go by (inaudible) and, and, and tomorrow 5:30. I'll be there. Okay?" BENTON JR. replied, "5:30 tomorrow it's gonna be ready?" MERIDA replied, "Yes." BENTON JR. replied, "Alright. Please man. I need you. Please. I'm waiting. Alright. Alright. Alright." MERIDA responded, "Okay. Okay. I believe MERIDA asked if BENTON JR. wanted to meet immediately for MERIDA's cocaine delivery or wait until the following day. Both parties had difficulty understanding each other and MERIDA finally informed BENTON JR. they would meet the following day (June 6, 2018) to conduct the transaction. BENTON JR. asked if the cocaine would be ready and MERIDA replied, 'Yes'. BENTON JR. began insisting on the cocaine delivery by stating, 'Please man. I need you'.

42. On June 5, 2018 at approximately 5:23 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown male at cellular facility (234)706-1101 that read: "2morrow

by 7 have already what u want". Affiant believes BENTON JR. informed the unknown male that tomorrow by 7 p.m. he would have the cocaine ready for the unknown male and asked how much cocaine he wanted.

43. On June 6, 2018 investigators conducted all-day surveillance of MERIDA and BENTON JR. in an attempt to determine where MERIDA obtained the cocaine from and surveil the subsequent delivery to BENTON JR. Shortly after 4:30 p.m. BENTON JR. was observed via pole camera as he arrived at 696 Carlysle Street. At approximately 4:43 p.m. BENTON JR. placed an outgoing call from TT-1 to MERIDA at (330) 957-9907 that MERIDA did not answer. At the same time air and ground surveillance units noted MERIDA and 3 unidentified Hispanic male were apparently packing up MERIDA's van and getting off work for the day. At approximately 4:58:07 p.m. MERIDA sent an outgoing SMS message from (330) 957-9907 to BENTON JR. at TT-1 that read: "No no call". At approximately 4:58:22 p.m. MERIDA sent an additional outgoing SMS message from (330) 957-9907 to BENTON JR. at TT-1 that read: "Hot". I believe MERIDA instructed BENTON JR. not to call his phone as MERIDA was aware of law enforcement presence and / or surveillance units referring to them as 'hot'. I am aware from training and experience in similar investigations that "hot" is common street terminology frequently used to describe law enforcement presence. Additionally, during the surveillance operation MERIDA was observed on 2 occasions looking up at a helicopter assigned to air surveillance of MERIDA. After the second time MERIDA looked up at the helicopter it was removed from surveillance however, it was too late and the surveillance operation was later terminated when BENTON JR. finally left 696 Carlysle Street (presumably when he realized MERIDA was not coming to deliver the cocaine).

44. At approximately 9:30 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to MERIDA at (330) 957-9907 that read, "Ok let no when". I believe BENTON JR. told MERIDA to let him know when MERIDA was ready to conduct the cocaine delivery.

45. On June 7, 2018 at approximately 6:47 p.m. MERIDA placed an outgoing call from cellular facility (330) 690-5014 to BENTON JR. at TT-1. During the conversation MERIDA stated, "Hey, hey, I got no nothing. Okay?" BENTON JR. replied, "Alright." MERIDA then stated, "Alright. And I got something behind me. I think. I don't know. Somebody but I just gotta be away for a couple weeks Okay? For sure because I no wanna goin to jail. Alright?" BENTON JR. replied, "Alright, Alright." Shortly after MERIDA stated, "Alright. I call you, I call you." BENTON JR. responded, "Alright. Bless you." MERIDA reiterated, "No call me on the other phone." BENTON JR. responded, "Alright." I believe MERIDA informed BENTON JR. that he did not have cocaine referred to as 'I got no nothing' and that he believed he may have been followed by law enforcement on June 6 by stating 'And I got something behind me. I think. I don't know.' MERIDA informed BENTON JR. he would not be able to supply him with cocaine for a couple weeks by stating 'I just gotta be away for a couple weeks' until things settled down, because if it was in fact law enforcement following him he did not want to get caught delivering cocaine to BENTON JR. and risk going to jail. MERIDA then told BENTON JR. not to call him at his (330) 957-9907 phone anymore suspecting that in mite be subject to Title III interception.

46. On June 15, 2018 at approximately 11:01 a.m. BENTON JR. placed an outgoing call from TT-1 to MERIDA at cellular facility (330) 957-9907. During the call BENTON JR. stated, "Yo" and MERIDA responded, "Yeah." BENTON JR. stated, "Call me." MERIDA

replied, "What I told you? What I told you?" BENTON JR. stated, "I, I ain't know the number just call me." MERIDA then hung up the phone on BENTON JR. I believe BENTON JR. called MERIDA to check the status of a cocaine delivery MERIDA was to send to BENTON JR. MERIDA became angry with BENTON JR. because BENTON JR. called his phone after being instructed by MERIDA not to call it. BENTON JR. tried to tell MERIDA that he didn't know MERIDA's new phone number thus he had to call MERIDA at (330) 957-9907. MERIDA then hung up the phone on BENTON JR.

47. On June 18, 2018 at approximately 7:03 p.m. MERIDA placed an outgoing call from cellular facility (330) 541-6143 to BENTON JR. at TT-1. During the conversation MERIDA stated, "Never call me on my phone. My phone is bad number, you know? It's my business phone at work. Okay?" BENTON JR. replied, "Yeah. What's up?" MERIDA stated, "Okay, uh, I'm pass for there tomorrow at I can (inaudible)." BENTON JR. asked, "What?" MERIDA replied, "I'm pass over there five thirty (5:30) tomorrow." BENTON JR. responded, "Alright. I'll be there." MERIDA stated, "Alright, thank you." I believe MERIDA instructed BENTON JR. not to call his primary phone (330) 957-9907 because he uses it for his legitimate dry wall business. MERIDA went on to tell BENTON JR. that he planned on meeting with BENTON JR. the following day (June 19, 2018) at 696 Carlysle Street and BENTON JR. confirmed he would be there.

48. On June 19, 2018 at approximately 7:56 a.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at (330) 615-9176 that read: "Nite get down today". I believe BENTON JR. informed the unknown individual that he might receive a delivery of cocaine today (from MERIDA).

49. On June 19, 2018 at approximately 6:37 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to VIRDEN at cellular facility (234) 706-1101 that read: "What u wanted". BENTON JR. immediately sent another SMS message from TT-1 to VIRDEN at cellular facility (234) 706-1101 that read: Get ready next hour". I believe BENTON JR. asked VIRDEN how much cocaine he wanted and that it would be delivered to BENTON JR. in the next hour.

50. On June 19, 2018 at approximately 6:39 p.m. VIRDEN sent an outgoing SMS message from cellular facility (234) 706-1101 to BENTON JR. at TT-1 that read: "3". I believe VIRDEN asked BENTON JR. for 3 kilograms of cocaine.

51. On June 19, 2018 at approximately 7:38 p.m. MERIDA sent an outgoing SMS message from cellular facility (330) 541-6143 to BENTON JR. at TT-1 that read: "10 mines". BENTON JR. immediately replied back from TT-1 to MERIDA at cellular facility (330) 541-6143 with an SMS message that read: "Ok". I believe MERIDA told BENTON JR. he would arrive at 696 Carlysle Street to meet in ten minutes.[3]

52. On June 19, 2018 at approximately 8:20 p.m. BENTON JR. placed an outgoing call over TT-1 to VIRDEN at cellular facility (234) 706-1101. During the conversation BENTON

---

[3] At approximately 8:15 p.m. investigators observed via pole camera, a red, 2010 Toyota 4DR sedan bearing Ohio registration HLD 9609 arrive at 696 Carlysle Street. A Hispanic male exited the passenger seat of the vehicle and met with BENTON JR. at the rear door and entered the residence. Both parties engaged in a brief verbal conversation in the rear doorway. At 8:20 p.m. the Hispanic male exited the rear door and returned to the vehicle which then departed.

JR. stated, "They pulled up talking about two more days but it's for sure. Man I thought they w: pulling up with it. They pulled, they pulled up to fucking talk. I'm mad." VIRDEN stated, "Man dog. You been sitting here and I'm up here sweating bullets man counting this mother fucking money man." Shortly after VIRDEN asked, "You said what?" BENTON JR. stated, "...this is some bullshit. They just, just left, man. That's why." Shortly after VIRDEN asked, "What is wrong with these mother fuckers, man," BENTON JR. replied, "Man, they talking about some bullshit. And they wanted to make sure I'm ready and they had to wait until something (inaudible) some bullshit. But they said for sure Friday or Saturday, they said." VIRDEN asked, "Is it right?" BENTON JR. replied, "Oh yeah, they said they had to make sure it was right and this, and this, and that. A whole bunch of bullshit." VIRDEN responded, "Man." BENTON JR. stated, "I'm just (inaudible) said two more days though, a couple more days." VIRDEN replied, "Alright." I believe BENTON JR. told VIRDEN that he had just met with his Hispanic cocaine supplier and they told him it would be two more days and they would deliver him cocaine and that the deal was for sure. VIRDEN became angry because he assumed the cocaine was being delivered on June 19, 2018 thus, VIRDEN began traveling towards 696 Carlysle Street with a substantial amount of currency to purchase some of the cocaine from BENTON JR. VIRDEN was worried that he was going to be stopped by police with the currency referred to as 'sweating bullets'; VIRDEN reiterated that the cocaine would be delivered Friday (June 22) or Saturday (June 23). VIRDEN asked if it was going to be a significant delivery referred to as 'Is it right' to which BENTON JR. confirmed by stating 'Oh yeah'.

53. On June 19, 2018 at approximately 8:23 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (234) 706-9585 that read: "Man they just pul to c what up talking 2 mo days". I believe BENTON JR. told the unknown individual that his cocaine suppliers just pulled up to see if BENTON JR. was ready to accept a delivery of cocaine and that the delivery would arrive in 2 more days.

54. On June 19, 2018 at approximately 8:28 p.m. an unknown individual sent an outgoing SMS message from cellular facility (234) 706-9585 to BENTON JR. at TT-1 that read: "Fuck it we gone wait peace be steal my nigga". I believe the unknown individual stated: we are going to wait in peace (for the cocaine delivery) and for BENTON JR. to be still.

55. On June 19, 2018 at approximately 8:29 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (234) 706-9585 that read: "Rite it on way tho sit tigggt). I believe BENTON JR. stated, "Right it (the cocaine) is on the way sit tight."

56. On June 19, 2018 at approximately 8:24 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (216) 835-9396 that read: "2 mo days they talking". The unknown individual immediately sent an outgoing SMS message from cellular facility (216) 835-9396 to BENTON JR. at TT-1 that read: "Ok". I believe BENTON JR. informed the unknown individual that his cocaine supplier(s) told him the cocaine would be delivered to BENTON JR. in 2 more days.

57. On June 19, 2018 at approximately 8:25 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (330) 697-4316 that read: "They talking couple mo days". I believe BENTON JR. informed the unknown individual that his cocaine supplier(s) told him the cocaine would be delivered to BENTON JR. in a couple more days.

58. On June 19, 2018 at approximately 8:26 p.m. an unknown individual sent an outgoing SMS message from cellular facility (330) 697-4316 to BENTON JR. at TT-1 that read: "Damn had people ready". I believe the unknown individual was frustrated as the individual

*Rule 12(1)*

*defective*
*Search warrant*

*where is actual probable cause*
*Never mentions actual*
*wire Interception*
*on June 26 2018*

assumed the cocaine would be available on June 19 and the individual had customers ready to purchase it.

59.  On June 19, 2018 at approximately 8:26 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (330) 697-4316 that read: "Ma me too smh". I believe BENTON JR. the unknown individual he also had customers waiting fo cocaine and he too was frustrated referred to as 'smh' known to an abbreviated form of "shaking my head".

60.  On June 19, 2018 at approximately 8:34 p.m. an unknown individual sent an outgoing SMS message from cellular facility (330) 697-4316 to BENTON JR. at TT-1 that read "Is it fasho u think". I believe the unknown individual asked BENTON JR. if the cocaine delivery was for sure going to happen.

61.  On June 19, 2018 at approximately 9:04 p.m. BENTON JR. sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (330) 697-4316 that read: "Yup". I believe BENTON JR. confirmed the cocaine delivery was "for sure".

62.  On June 22, 2018 at approximately 6:57 a.m. BENTON JR. sent an outgoing SMS message from TT-1 to MERIDA at cellular facility (330) 541-6143 that read: "I'm up". I believe BENTON JR. told MERIDA he was awake and ready to accept a delivery of cocaine from MERIDA.

63.  Affiant is aware from a review of pole camera footage, intercepted conversations, physical surveillance and other law enforcement activities that BENTON JR.'s mother Crystal Shannon resides at 698 Carlyle Street known to be the duplex apartment next to BENTON JR.'s apartment of 696 Carlyle Street where BENTON JR. conducts the bulk of his drug trafficking activities. A review of pole camera footage clearly shows BENTON JR. has access to 698 Carlyle Street as he has been observed on multiple occasions entering and exiting the apartment on his own. Additionally, a review of the Summit County Auditor's website reveals that BENTON JR. and Crystal Shannon are the listed owners of the structure which contains both apartment units. Affiant has included a copy of the Summit County Auditor's information identifying BENTON JR. and Crystal Shannon with this Affidavit. Due to these circumstances as well as the proximity of 698 Carlyle Street to 696 Carlyle Street (directly next door) to where BENTON JR. conducts the bulk of his drug trafficking activities and for the reasons enumerated above, Affiant requests authority to conduct a records and documents search warrant at 698 Carlyle Street.

*So where the actual probable cause to search on June 26th 2018 was signed!*

## AFFIANT'S CONCLUSIONS

*Jim Laurie  Clerk  JUN 27*

64.  Based upon the foregoing, Affiant asserts there is probable cause to believe that WILLIE R. BENTON JR., ARMANDO MERIDA, TERRENCE BOYD, MATTHEW VIRDEN, and others known and unknown, are presently involved in violations of Ohio Revised Code 2925.03 Trafficking in Drugs (cocaine and/or crystal methamphetamine) and 2925.11 Possession of Drugs (cocaine and/or crystal methamphetamine). Additionally, BENTON JR. has displayed an ongoing pattern of criminal conduct at 696 Carlysle Street that has been confirmed through a controlled purchase of cocaine on March 15, 2018, pole camera surveillance, physical surveillance, intercepted conversations and SMS messages, and other law enforcement activities. As a result of this conduct Affiant has probable cause to believe cocaine and crystal methamphetamine are being stored, and will continue to be stored at 698 Carlysle Street Akron, Ohio.

*probable cause must exist at time of ISSUANCE?*

*lacks probable cause*

*entire invalid warrant*

65. Affiant knows from personal participation in this investigation and from information provided by investigating detectives that surveillance, controlled buys, undercover operations, and interviews has revealed a substantial cocaine trafficking conspiracy involving WILLIE R. BENTON JR., ARMANDO MERIDA and others known and not yet known. Based on the foregoing and the nature of the above ongoing investigation, there is probable cause to believe that the requested warrant and order will continue to provide evidence regarding the activities described above.

66. Affiant is aware that illegal drug transactions involve the transfer of large quantities of cash and that in the affiant's experience such transactions involve records and documents relating to drug sales and accompanying cash transfers.

67. Affiant, through personal experience and training, is aware that individuals involved in the illegal activity of trafficking in controlled substances maintain their own security by use of firearms and other weapons. Affiant requests authority to search all individuals coming into the premises or who are on the curtilage or within the premises at the time of the execution of the search warrant in order to insure the safety of such individuals, the investigating officers and innocent persons. Due to BENTON JR.'s extensive criminal history to include convictions for drug trafficking Affiant will utilize a SWAT Team as a means of securing the residence and to ensure the safety of all parties present during the execution of the warrant.

68. Personal knowledge of the affiant that persons involved in drug trafficking often keep written records of such drug transactions and equipment and scales used for the processing and packaging of drugs for sale.

69. Personal knowledge of the affiant that the Controlled Substance: cocaine, crystal methamphetamine, and marijuana is easily disposed of because of it's characteristics (lack of bulk, texture and it's flammability) and has noted through his experience and training that even relatively large quantities of cocaine, crystal methamphetamine, and marijuana may be disposed of by burning for flushing down the commode, and act which can be done in seconds. Though this affiant will fully comply with notice of entry and authority to search, the affiant maintains that the circumstances enumerated (easy disposal by burning or flushing) herein mandate that a swift entrance into the above described premises is essential to avoid the destruction of evidence, and to protect the safety of all parties involved.

70. Personal knowledge of the Affiant that the controlled substance, crack cocaine, may be possessed in quantities which are relatively low in bulk and weight and are easily secreted within the clothing of the possessor, a search of the occupants of the house is thereby necessary.

71. Affiant requests authority for a night time search for the reasons that affiant has reason to believe that the events listed above and the scope of the investigation may continue into the night time hours and, through affiant's experience and training, individuals involved in illegal drug sales maintain late hours in pursuit of their illicit enterprise.

72. This Affidavit was reviewed by City of Akron, Ohio Police Legal Advisor Craig Morgan and subsequently approved.

*invalid warrant*

*why 5th*

*NO prosecutor from state*

Sworn to and subscribed in my presence by the above named Affiant this ___ day of June, 2018.

*why3 25th*

*filed 27th tho*

*why waited to file?*

AFFIANT

JUDGE, Akron Municipal Court

*[handwritten top margin:]* Exhibits C  proof next day  FRANKS violation

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

*[handwritten left margin:]* Source

| 1. Program Code | | 2. Cross File | | Related Files | | | Page 1 of 5 |
|---|---|---|---|---|---|---|---|

5. By: Daniel D Wehrmeyer, SA
At: CLEVELAND, OH DISTRICT OFFICE (D-44)

*[handwritten:]* Criminal Complaint Agent

7. ☐ Closed ☐ Requested Action Completed
☐ Action Requested By:

9. Other Officers:

| 3. File No. | 4. G-DEP Identifier |
|---|---|
| 10-10-0032 | YGC1B |

6. File Title
BENTON Jr., Willie R.

8. Date Prepared
07-03-2018

10. Report Re: Arrest of Armando V. MERIDA on 6-26-18 and the seizure of exhibits N-1 and N-1a.

### SYNOPSIS

*[handwritten:]* CRIMINAL COMPLAINT  SOURCE 2 stories falsehood  Was not TRUE  in criminal complaint

On June 26, 2018, Agents/Detectives from the Akron-Summit County HIDTA Initiative conducted mobile, stationary and electronic surveillance on Willie R. BENTON JR. and Armando V. MERIDA. This surveillance operation resulted in the arrest of BENTON and MERIDA and the seizure of $94,190 in U.S. currency.

### DETAILS

*[handwritten:]* not in warrants  Wiretap was real  withheld out complaint probable cau  actual

1. On June 26, 2018, investigators learned from a court authorized wire and electronic intercept (i.e. T-III) being conducted on Willie R. BENTON's JR. (470) 214-0060 that at approximately 11:12 a.m., BENTON received an incoming call from his cocaine supplier identified as Armando V. MERIDA from cellular telephone number (330) 541-6143 (Call #11,176). BENTON answered and stated "Hello." MERIDA replied "Be ready at 6:30." BENTON said "Hello" and MERIDA replied "Ready at 6:30". BENTON repeated "6:30!" MERIDA replied "Hmm-uhu". BENTON replied "Alright I'll be there." MERIDA replied but it was unintelligible. SA Wehrmeyer and other investigators familiar with this investigation and based on prior meetings between BENTON and MERIDA believed they were going to meet at 696 Carlysle Street a residence associated with BENTON's drug trafficking activities and the same location where a pole camera was installed overlooking the above residence.

2. On June 26, 2018, at approximately 4:30 p.m., investigators and with

| 11. Distribution: | | 12. Signature (Agent) | | 13. Date |
|---|---|---|---|---|
| Division | *[handwritten:]* SA says source no complaint | /s/ Daniel D Wehrmeyer, SA | | 07-03-2018 |
| District | | | | |
| Other | | 14. Approved (Name and Title) | | 15. Date |
| | | /s/ Erik J Kochanowski, GS | | 07-09-2018 |

DEA Form - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

*[handwritten bottom:]* actual probable cause withheld ... Agents ... prosecutor

IN THE AKRON MUNICIPAL COURT
SUMMIT COUNTY, OHIO

NOTICE OF CLERK OBSTRUCTION AND REQUEST FOR SUPERVISORY REVIEW

Now comes Willie Benton, and hereby notifies this Honorable Court and its
administrative authority that the Clerk of Court has refused to accept or docket a
Post-Conviction Relief Motion regarding a search warrant issued by Judge Nichol
Walker on or about June 20, 2025.

Despite multiple attempts to file the motion both in person and by mail, the Clerk's
Office insists that no case record exists and has refused to provide a docket number
or formal denial.

This conduct violates my constitutional right of access to the courts under the
First and Fourteenth Amendments to the United States Constitution and Article I,
Sections 1 and 16 of the Ohio Constitution.

I respectfully request that the Presiding Judge or appropriate authority:

1. Direct the Clerk to docket the motion under a new or miscellaneous case number;
2. Acknowledge the existence of the sealed warrant and ensure a record is created
for adjudication;
3. Issue an administrative order or guidance on how post-conviction filings are to
be submitted when no case number exists due to sealing or suppression.

Respectfully submitted,

Willie Benton #65749060
2240 Hubbard Rd
Youngstown OH 44505

Mandamus Complaint to Summit County Common Pleas Court

IN THE COURT OF COMMON PLEAS
SUMMIT COUNTY, OHIO

Willie Benton #65749060
2240 Hubbard Rd
Youngstown OH 44505
Petitioner,
v.
AKRON MUNICIPAL COURT CLERK'S OFFICE
217 S High Street
Akron, OH 44308
Respondent.

CASE NO.CR-51800406

COMPLAINT FOR WRIT OF MANDAMUS
AND DECLARATORY RELIEF

Now comes petitioner Willie Benton, pro se, and states as follows:

1. Petitioner attempted to file a Post-Conviction Relief Motion concerning a search warrant issued by Judge Nichol Walker in Akron Municipal Court on or about June 20, 2025.

2. Petitioner was never brought before a state judge regarding the warrant, and the warrant and its affidavit were sealed for a significant period, denying Petitioner the opportunity to challenge it.

3. The Akron Municipal Court Clerk's Office has refused to accept or docket the motion, citing that no open case exists, and refuses to assign a miscellaneous docket or provide a denial in writing.

4. Petitioner seeks to challenge a state action (a warrant and seizure of evidence), and is entitled to access the court to do so.

5. The refusal by the Clerk's Office obstructs Petitioner's constitutional right to access the courts, in violation of both federal and state law.

WHEREFORE, Petitioner respectfully prays this Court:

A. Issue a Writ of Mandamus compelling the Akron Municipal Court Clerk's Office to accept and docket Petitioner's Post-Conviction Relief Motion;

B. Grant declaratory relief stating that the Clerk's refusal violates Petitioner's right to access the court;

C. Order any further relief this Court deems just and proper.

Willie Benton #65749060
2240 Hubbard Rd
Youngstown OH 44505

Presiding Judge
Akron Municipal Court
217 S. High Street
Akron, OH 44308

RE: Denial of Access to Court — Sealed Warrant Issued by Judge Nichol Walker

Dear Presiding Judge,

I am writing to respectfully report and seek redress for repeated denials by the Clerk's Office in accepting my post-conviction motion for filing. This motion concerns a sealed search warrant issued on or about June 26, 2018, by Judge Nichol Walker in Akron Municipal Court. I have been unable to obtain a case number or access any docket related to the warrant, despite being arrested and prosecuted based on the warrant's execution.

I have attempted to file my post-conviction motion in person and by mail, asking the Clerk's Office to docket it under a new or miscellaneous number or to assign a judge. Each time, the Clerk has refused to accept the filing, leaving me with no procedural remedy.

I respectfully request your immediate administrative attention and direction to allow the court to docket and review this motion. I have preserved my filings and am prepared to submit them again upon your instruction.

Thank you for your time and consideration of this urgent constitutional issue.

Sincerely,
Willie Benton #65749060
2240 Hubbard Rd
Youngstown OH 44505

# MOTION TO COMPEL CLERK TO DOCKET PREVIOUSLY FILED MOTION

IN THE AKRON MUNICIPAL COURT
SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | Case No: 518:CR00406 |
| v. | ) | |
| | ) | MOTION TO COMPEL CLERK TO DOCKET |
| WILLIE BENTON | ) | POST-CONVICTION MOTION |
| | ) | |

NOW COMES the Petitioner, WILLIE BENTON, and respectfully requests this Court
to issue an order to the Akron Municipal Clerk of Court directing the Clerk
to:

1. **Accept and docket** Petitioner's previously submitted **Post-Conviction
Relief Motion**, filed on or about **[insert date of filing]**, and
2. Create a miscellaneous case or docket number to preserve the
constitutional challenge and allow judicial review.

### GROUNDS:

- Petitioner filed a PCR motion related to a search warrant issued by this
Court on June 27, 2018;
- The Clerk and bailiff informed Petitioner that **no case exists** and
therefore the motion would not be accepted;
- Petitioner maintains that **the Court issued the warrant**, and therefore
retains jurisdiction over the warrant, the affidavit, and any constitutional
challenges related to them;
- Under **State ex rel. Russell v. Thornton, 111 Ohio St.3d 409 (2006)**, a
Clerk of Court **must accept and docket proper filings**, even where no
formal case number exists.

Petitioner asks the Court to protect the judicial record, the integrity of
the Fourth Amendment, and the right of all persons to access the courts.

Respectfully submitted,
Willie Benton
Inmate #657-49-060
2240 Hubbard Rd Youngstown Oh 44505
Dated: July _2_, 2025



# DECLARATION OF WILLIE BENTON

I, Willie Benton, declare under penalty of perjury and pursuant to the laws of the State of Ohio that the following is true and correct to the best of my knowledge:

1. My name is **Willie Benton**, Inmate #657-49-060. I am currently incarcerated in federal custody in connection with criminal charges filed in the **United States District Court for the Northern District of Ohio** on or about **June 27, 2018**.

2. On June 27, 2018, at approximately 11:33 AM, a search warrant was issued by Judge Nichol Walker of the Akron Municipal Court that led to my arrest and the seizure of evidence later used in my federal criminal complaint.

3. I was never brought before the Akron Municipal Court for a preliminary hearing or for review of the search warrant or affidavit. I was not given notice of the warrant proceedings, nor did I have any opportunity to challenge the probable cause or request to suppress the evidence.

4. At approximately 3:00 PM on the same day (June 27, 2018), a federal Special Agent filed a criminal complaint based on the evidence obtained through that municipal court warrant. I was taken into federal custody and appeared before a federal magistrate on June 28, 2018.

5. The federal judge never asked me to waive any challenge to the municipal search warrant, and **no one informed me that a state court had issued the warrant.** The prosecutor never disclosed the source of the warrant or the affidavit in federal court.

6. On or about [insert date of recent filing – approx. 2 weeks ago], I filed a **Post-Conviction Relief Motion** in Akron Municipal Court before Judge Nichol Walker, challenging the lawfulness of that search warrant. *June 17th*

7. On or about **July 1, 2025**, I contacted the Akron Municipal Court to check the status of my motion. The bailiff informed me that there was no record of a case, and therefore they would not accept the filing.

8. I then contacted the Clerk of Courts, who also stated that **no warrant record existed**, and further explained that **records are only retained for five (5) years** — even though I am only four days past the 7-year mark from June 27, 2018.

9. I am making every effort in good faith to locate, preserve, and review the original warrant and affidavit issued by Judge Walker, which were never disclosed to me and which I was never given an opportunity to contest in court.

10. I respectfully request that this Court unseal any records relating to the June 27, 2018 search warrant, and direct the Clerk to accept and docket my previously submitted post-conviction motion so I may protect my constitutional rights.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _2__ day of July, 2025

Willie Benton
Inmate #657-49-060
2240 Hubbard Rd Youngstown OH 44505

*Newly discovered*

*evidence invalid search warrants And criminal Complaint used without proper procedure by allowing + challenge DEPRIVED*

*illegal Arrest*



## MIKE DEWINE
### • OHIO ATTORNEY GENERAL •

*Malicious Prosecution*

*Deprivation of Due Process*

Bureau of Criminal Investigation

Laboratory Report

To:
Summit County Drug Unit
Detective C. R. Ingram
53 University Avenue
Akron, OH 44308

BCI Laboratory Number: 18-35800

Date: July 13, 2018

Offense: Drug Trafficking
Subject(s): Willie R Benton
Victim(s): State of Ohio

Agency Case Number: DU-3616

*July 24 2018*
*indicted*

### Submitted on July 09, 2018 by Detective Carmen R. Ingram:

1. Evidence bag containing unknown substance (DU-18-38281).
2. Evidence bag containing unknown substance (DU-18-38282).
3. Evidence bag containing unknown substance (DU-18-38289) (DU-18-38290).
4. Evidence bag containing unknown substance (DU-18-38290) (DU-18-38289).

### Findings

1. Three (3) foil wrapped packages each with a white substance - 2,968.97 g +/- 0.09 g - found to contain Cocaine. Determined using instrumental analysis.

2. White substance - 988.22 g +/- 0.09 g - found to contain Cocaine. Determined using instrumental analysis.

3. Yellow substance - 991.29 g +/- 0.09 g - found to contain Cocaine base (Crack Cocaine). Determined using instrumental analysis.

4. Two (2) plastic wrapped packages each with yellow substance - 1,932.49 g +/- 0.09 g - found to contain Cocaine base (Crack Cocaine). Determined using instrumental analysis.

### Remarks
All items will be returned to your department.

*KeitH taggArt why*
*You SAY on Record CRACK*
*BECAUSE*
*IM*
*BLACK?*
*16*

Please address inquiries to the office indicated, using the BCI case number.

[ ] BCI -Bowling Green Office
750 North College Drive
Bowling Green, OH 43402
Phone:(419)353-5603

[ ] BCI -London Office
1560 St Rt 56 SW P.O. Box 365
London, OH 43140
Phone:(740)845-2000

[X] BCI -Richfield Office
4055 Highlander Pkwy, Suite A
Richfield, OH 44286
Phone:(330)659-4600

[ ] BCI -Springfield Office
130 N. Fountain Ave
Springfield, OH 45502
Phone:(937)688-2585

Page 1 of 2

*Notably, The BCI report does not label any item explicity as "CRACK". The language "cocaine base (crack cocaine)" appears only as a generic "parenthetical within the laboratory form template. The instrument itself Cannot Identify "CRACK". This is why GRAND JURY Never indicted for CRACK AND Prosecutor witheld TRUE Identity"*



*Why did You allow AND NO oversight.*

*Justice*

# DAVE YOST
## OHIO ATTORNEY GENERAL

Bureau of Criminal Investigation

**Laboratory Report**
Chemistry
Amended

To:       Summit County Drug Unit
          Det. D. Edwardson
          53 University Avenue
          Akron, OH 44308

BCI Laboratory Number:     18-35800

Analysis Date:             Issue Date:
May 13, 2024               May 17, 2024

Agency Case Number:        DU-3616

Offense:       Drug Trafficking
Subject(s):    Willie R Benton
Victim(s):     State of Ohio

### Submitted on May 13, 2024 by Jimmy Fields:

1.   Evidence bag containing unknown substance (DU-18-38281).
2.   Evidence bag containing unknown substance (DU-18-38282).
3.   Evidence bag containing unknown substance (~~DU-18-38289~~) (DU-18-38290).
4.   Evidence bag containing unknown substance (~~DU-18-38290~~) (DU-18-38289).

*- Jist ignored 2*
*"Pete Daly"*
*NEW prosecutor!*

### Findings:  *Why did not Anybody fix*

1.   Three (3) sealed plastic bags each containing white powder substance - 2,952.3 g +/- 1.5 g - found to contain Cocaine. Determined using chemical testing and instrumental analysis.

2.   One (1) sealed plastic bag containing white powder substance - 984.1 g +/- 1.5 g - found to contain Cocaine. Determined using chemical testing and instrumental analysis.

3.   One (1) sealed plastic bag containing off-white substance - 981.5 g +/- 1.5 g - found to contain Cocaine base (Crack Cocaine). Determined using chemical testing and instrumental analysis.

4.   Two (2) sealed plastic bags each containing off-white substance - 1,916.1 g +/- 1.5 g - found to contain Cocaine base (Crack Cocaine). Determined using chemical testing and instrumental analysis.

Please address inquiries to the office indicated, using the BCI case number.

[ ] BCI -Bowling Green Office        [ ] BCI -London Office              [X] BCI -Richfield Office            [ ] BCI -Springfield Office
750 North College Drive             1560 St Rt 56 SW P.O. Box 365        4055 Highlander Pkwy. Suite A        130 N. Fountain Ave
Bowling Green, OH 43402             London, OH 43140                    Richfield, OH 44286                  Springfield, OH 45502
Phone:(419)353-5603                 Phone:(740)845-2000                 Phone:(330)659-4600                  Phone:(937)688-2585

Page 1 of 2
*AP*

*"BRADY" violation withholding" Cocaine base element from Grand Jury" DECEPTION!*

*[handwritten annotations:]* ← BACK

**EUIdence**

Failed to put my witnesses on stand Mary + Davine Harris

failed test substance

## BURDON & MERLITTI
(an association of independent attorneys)

LAWRENCE J. WHITNEY, LPA.
PAUL F. ADAMSON
JAMES E. BARTH
NATHAN A. RAY

JAMES L. BURDON, OF COUNSEL *
JAMES R. MERLITTI, LPA.

111 SOUTH MAIN STREET, SUITE 201
THE DELAWARE BUILDING
AKRON, OHIO 44308
PHONE (330) 253-7171
FAX (330) 253-7110
email: burdonmerlitti@msn.com
* of Counsel

THOMAS M. BAKER, JR.
TYLER J. WHITNEY
JOSEPH E. COUGHLIN
VINCENT WILLS *

BRUCE B. CONRAD WELSON
NANCY J. FLOYED, PARENT

*[handwritten:]* 2255 GRANITE
July 2 2025

*[handwritten:]* category 6 yrs for years failed to-investigate

*[handwritten:]* Showing why did not TEST or

August 7, 2020

*[handwritten:]* due INVESTIGATIVE Duties

Willie Benton # 65749060
P.O. Box 5000
Bruceton Mills, WV 26525

Dear Willie:

*[handwritten:]* Never saw Photos till 2025 on Remand lawyer failed to go over discovery with me ineffective

*[handwritten, vertical right margin:]* FAIL COUNSEL

We have tried multiple times to set up a telephone conference with you at the institution but were unable. In your letter dated August 3, 2020, you requested that I acknowledge:

*[handwritten left margin:]* Did not even try to find one it was difficult stat boss That even meant?

1. No, I did not get a private expert to analyze the drugs. It was difficult to find an expert but the government let me talk directly to their expert. As I explained to you the only issue was whether or not there was a detectible amount of crack in the drug. It didn't matter if it was 50% or just .01%. If there was a detectible amount then the whole weight was counted. *[handwritten:]* detectible amount of Cocaine base never was said to be Crack

*[handwritten right margin:]* For Sentencing 50% or 1% did matter

2. I did not put Harris on the stand. If he is the guy who said the gun was his then I did not. He told me one thing and told your mother another. He could not even tell me what caliber the gun was or where it was. He said he bought it legitimately but couldn't get the documents then he said he did not buy it legitimately. He was obviously not telling the truth and just trying to help you. Most importantly, the issue was not ownership but was possession. Constructive Possession is defined as having control. *[handwritten:]* Re Gardless his testimony and my Moms was Needed You believe he was lying Did not matter

*[handwritten left margin:]* Never had control or possesed

3. I did tell you that your only recourse was to argue that you had no intent to sell those drugs, that they were junk and could not be sold. As you know, the police agreed that this was junk but did not agree that you would not sell the drugs. The fact that you kept the drugs and did not throw them away was not helpful. It was my advice to you to enter a plea and argue about the relevant conduct and the gun and preserve those issues for appeal.

*[handwritten right margin:]* I To The Facts

*[handwritten vertical right margin:]* Failed to Discover and Seize counsel Invalid warrants

As I stated, ownership of the gun was not relevant only the constructive possession.

*[handwritten:]* Yes Ownership mattered if I had no Knowledge of A Gun Period Dense was only